# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
WALKER,[1] EWING,[2] and PARKER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Private First Class E3 JEROME J. FORREST**
**United States Army, Appellant**

ARMY 20200715

Headquarters, Fort Campbell (trial)
Headquarters, Combined Arms Center and Fort Leavenworth (*DuBay*)
Matthew Calarco, Military Judge (arraignment)
Jacqueline Tubbs, Military Judge (trial)
Steven C. Henricks, Military Judge (*DuBay*)
Colonel Laura J. Calese, Staff Judge Advocate (trial)
Colonel Robert L. Manley, Staff Judge Advocate (*DuBay*)

For Appellant: Captain Ian P. Smith, JA (argued); Colonel Michael C. Friess, JA; Lieutenant Colonel Dale C. McFeatters, JA; Captain Lauren M. Teel, JA; Captain Ian P. Smith, JA; Captain Nandor F.R. Kiss, JA (on brief).

For Appellee: Captain Timothy R. Emmons, JA (argued); Colonel Christopher B. Burgess, JA; Lieutenant Colonel Craig J. Schapira, JA; Major Mark T. Robinson, JA; Captain Timothy R. Emmons, JA (on brief).

22 November 2024

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WALKER, Senior Judge:

---

[1] Senior Judge WALKER took final action in this case prior to her retirement.

[2] Judge EWING decided this case while on active duty.

Appellant was convicted of the unpremeditated murder of his wife by means of bludgeoning her to death while her two juvenile sons locked themselves in their upstairs bedroom and her baby granddaughter slept on a couch nearby. A military judge sentenced appellant to confinement for life with the possibility of parole. Before this court, appellant asserts that his trial defense counsel were ineffective by: (1) failing to properly prepare appellant's family members for their pre-sentencing testimony; (2) failing to investigate in preparation for pre-sentencing; and (3) failing to properly investigate appellant's head injury to provide a sufficient justification supporting appellant's motion to compel an expert in forensic psychology and neuropsychology. We disagree and find appellant has failed to show his trial defense counsel rendered deficient performance, and even if appellant could show this, he nonetheless has not shown prejudice.

## BACKGROUND

### A. Circumstances of the Victim's Murder

On 9 December 2018, appellant was involved in a high-speed car accident resulting in his loss of consciousness and requiring intubation. Appellant received level 1 trauma treatment, the highest level of medical treatment. According to medical records, appellant's Glascow Coma Scale score of 7[3] indicated a severe head injury. Medical personnel conducted Computerized Tomography (CT) scans of appellant's face, mouth, and jaws; chest, abdomen and pelvis; cervical spine; and head. There were no acute cranial bone fractures and there was no evidence of intracranial changes. The only injury noted was a fracture to the left nasal bone and possible sinus damage. Appellant's medical records do not show that he was diagnosed with traumatic brain injury (TBI) during his medical treatment for this incident. Appellant was discharged from the hospital the following day and prescribed Tylenol. Over the course of the next few days, appellant sought treatment from medical facilities on Fort Campbell complaining of body aches. He was prescribed Percocet for his pain.

---

[3] "The Glasgow Coma Scale (GCS) is used to objectively describe the extent of impaired consciousness in all types of acute medical and trauma patients. The scale assesses patients according to three aspects of responsiveness: eye-opening, motor, and verbal responses . . . . The Glasgow Coma Scale and its total score have since been incorporated in numerous clinical guidelines and scoring systems for victims of trauma or critical illness." Shobhit Jain & Lindsay M. Iverson, *Glasgow Coma Scale,* STATPEARLS PUBLISHING, June 12, 2023. A score of 3 to 8 on the GCS indicates severe trauma, a score of 9 to 12 indicates moderate trauma, and a score of 13 to 15 indicates mild trauma. *Id.*

On 17 December 2018, appellant and the victim argued over the condition of appellant's closet, located in a hallway near the kitchen. The argument continued to escalate as appellant and the victim moved into the kitchen. One of the victim's sons, ██, who was eating dinner in a room adjacent to the kitchen, witnessed appellant jump on top of the victim. Appellant held the victim down onto the floor by restraining her arms. The victim screamed for ██ to call the police. After ██ did so, appellant took ██'s cellphone from him. The victim told ██ to go upstairs and he complied. Upon hearing a loud "thump," ██ locked himself in his bedroom and began texting and audio messaging his older brother (not present in the house) on a gaming system asking for help. Meanwhile, ██ heard appellant walking up and down the stairs. Appellant banged on ██'s bedroom door and demanded entry, which ██ ignored. After appellant went back downstairs, ██ got his younger brother from the upstairs bathroom and locked them both inside his bedroom. ██ testified he then heard glass breaking and someone hitting something. When ██ called out for his mother, she did not respond. Via messages transmitted through ██'s gaming system, ██'s older brother convinced ██ to go downstairs and check on their mother. As ██ descended the stairs, he saw appellant in a first floor bathroom. When appellant noticed ██ on the stairs, he told ██ "I suggest you go back upstairs." ██ testified he observed blood in the bathroom sink.

A short time later, the victim's daughter, ██, arrived at appellant's residence with her husband. ██ had been informed by her brother, whom ██ was messaging, that ██ was concerned about the victim. When ██ and her husband arrived at the home, ██ was yelling for help from his second floor bedroom window. Upon his sister's request, ██ came downstairs and opened the front door to the residence. As the door opened, appellant slammed it shut. At that point, ██ proceeded to the back of the house. As ██ approached the kitchen window, she noticed the blinds in disarray and a red substance on the window. After pausing for a moment to catch her breath, ██ walked closer to the back door and bent down to look through the window. She observed her mother lying on the floor in front of the refrigerator. Her mother's arms and legs were spread out and her face was "bashed in." She also noticed debris scattered everywhere. When ██ knocked on the window, she noticed appellant standing in the kitchen looking at her. She then ran to the front of the house screaming and informed her husband that her mother was dead. ██'s husband called 911 and military police arrived at the scene a short time later.

Upon arrival at the scene, military police entered appellant's home. Two military police went immediately upstairs and retrieved the two young boys. One of the military police officers, Staff Sergeant (SSG) ██████, then proceeded to clear the downstairs while the other officer removed the two boys from the residence. Staff Sergeant ████ went through the living room to the kitchen area. He observed the victim lying in the kitchen area with "extensive damage to the face." Staff Sergeant ████ testified that he observed broken furniture, a china cabinet overturned, shattered glass on the floor, and an extensive amount of blood in

the area. There was blood spatter on the kitchen walls, the dining room walls, the ceiling, the walls of adjacent rooms, the refrigerator, and on various objects in the vicinity of the victim's body. There was a dining room chair broken into pieces near the victim's body. Observing the condition of the victim and the scene, SSG ███ called for paramedics. He did not locate appellant upon his first sweep of the home. After securing the crime scene, SSG ███ conducted a second sweep of appellant's residence to ensure no one else was in the home. Staff Sergeant ███ discovered appellant sitting in a vehicle inside the garage. When appellant refused commands to exit the vehicle, SSG ███ broke the glass on the driver's side door, unlocked the car door, and apprehended appellant. A piece of wood was sitting on the passenger seat along with a paper towel with a red substance on it. The paramedic who evaluated the victim on the scene testified she was not breathing, had no detectible pulse, and had no activity registered on an EKG.

Agents from the Criminal Investigation Command (CID) took appellant to their office to interview him and collected evidence from his person. Paramedics were called to the office because appellant complained that his hand hurt. The responding paramedic inquired about the source of appellant's hand injury and appellant explained he had been in a motorcycle accident the previous week. When the paramedic inquired why appellant's hand still required medical attention, appellant responded that he "hit something." Appellant was taken to the Fort Campbell hospital the following day where he was evaluated in the emergency room. A nurse conducting triage on appellant asked whether appellant experienced any homicidal ideations to which appellant replied, "[t]hat was last night."

*B. Defense Request for Experts*

On 11 January 2019, the government charged appellant with one specification of unpremeditated murder. The convening authority referred the charge to a general court-martial on 17 April 2019.

Appellant's original detailed military defense counsel, Captain (CPT) MJ, filed numerous pretrial motions, including a motion to appoint expert consultants in forensic psychology and neuropsychology, crime scene investigation and blood pattern analysis, and fact investigation. The defense requested the appointment of a specific expert, Doctor (Dr.) ███, in the area of forensic psychology and neuropsychology. One justification for this expert consultant related to the head injury appellant sustained in the motor vehicle accident the week prior to his wife's murder. In the defense motion to compel the production of Dr. ███ defense counsel asserted:

> [T]he Defense requires a neuropsychiatrist to examine the accused and determine if he suffered from a traumatic brain, concussion, or other injury the week prior to the death of his wife that might have affected

4

his cognition, judgment, or impulse control and explain it to the Defense team. The condition of PFC Forrest's brain at the time of the alleged murder could prove to be extenuating, mitigating, or disprove the intent element of the charged offense.

The defense also asserted the necessity of a forensic psychologist, the same Dr. ██, to assist in conducting mitigation interviews relating to appellant's childhood and "other factual circumstances in order to present a robust mitigation case." Given appellant was facing a potential sentence of life without the possibility of parole, the defense argued that Dr. ██ possessed specialized training as a forensic psychologist that would be "beneficial to conducting a proper mitigation assessment as well as training in assisting the defense in the presentation of a historical psychological background of [appellant]."

Just prior to the motions hearing, appellant released CPT MJ from further representation, resulting in a continuance. A few months later, newly detailed military defense counsel, Major (MAJ) DH and then CPT LW (a CPT at the time of trial), litigated defense motions. The new defense team relied upon the motion for expert consultants as filed by the previous military defense counsel. There were several enclosures to the motion including medical records from appellant's hospital treatment right after his vehicular accident. In litigating the request for a forensic psychologist, the military judge inquired whether there were additional tests or examinations that could be conducted to determine whether appellant suffered from a TBI as it was not evident from the medical records that appellant suffered a TBI from the motor vehicle accident. In response, MAJ DH highlighted that the CT scan conducted immediately after appellant's accident may not show whether there was a TBI. MAJ DH explained additional tests existed that could determine whether appellant suffered a TBI, and defense requested the appointment of a neuropsychologist to assist in those additional evaluations and tests. In litigating the defense justification for requesting Dr. ██ to also serve as a mitigation expert, the military judge inquired as to the authority for allowing a mitigation expert in a non-capital case. The defense responded that it had no authority readily available to provide the court. Before the military judge ruled on the defense motion to compel a forensic psychologist and neurologist, the government contacted defense counsel and inquired as to whether appellant "requested medical treatment in the form of a TBI screening" given the military judge's reference to TBI screening being the next potential step pertaining to the defense's expert request. Approximately a week later, the defense emailed the government and stated appellant "does not request TBI testing."

Before the military judge announced her ruling on the expert requests, the government approved the defense requests for a crime scene investigator and a fact investigator. The military judge issued her ruling on the record denying the defense motion to compel a forensic psychologist and neurologist. She found that the

defense failed to satisfy its burden to demonstrate what assistance Dr. ▇ would provide. The military judge held that there was no evidence before the court that appellant suffered from a TBI. She also noted that the defense declined additional TBI testing. Regarding Dr. ▇ serving as a mitigation expert, the military judge held that the defense failed to provide evidence that the defense team was unable to compile and present information about appellant's past and background for potential rehabilitation during a pre-sentencing hearing. On this basis, the military judge also noted that the defense had failed to establish why a mitigation expert was necessary in a non-capital case.

## C. The Trial Evidence

The government presented multiple types of forensic evidence at trial, including blood evidence, DNA analysis, and expert testimony from a bloodstain pattern expert.

During the investigation into the victim's death, law enforcement collected appellant's clothing and swabbed several areas of his body where there appeared to be the presence of blood. Law enforcement also swabbed blood stains from the dining room walls of the home, an overturned china cabinet near the victim's body, the refrigerator door, the piece of wood from the passenger seat of the car in which appellant was sitting when apprehended, and other areas of the home. Law enforcement submitted this physical evidence to a lab for analysis. A forensic biologist examined and tested multiple items for the presence of blood. The forensic biologist testified at trial that she detected blood on twenty-two separate items, which included: all four dining room walls; the refrigerator door; a soap dispenser in the downstairs bathroom; the piece of wood located on the passenger seat of appellant's car; appellants left hand and forearm; appellant's shins; the top of appellant's head; and, appellant's shirt, shorts, sandals, and the bottom of appellant's socks. The forensic biologist testified that the victim's DNA was detected on all the stains that tested positive for the presence of blood. Only the victim's DNA was detected in the blood stains from appellant's shirt, shorts, socks, appellant's right shin, the dining room walls, china cabinet, refrigerator door, front passenger seat of the car, and the soap dispenser. The forensic biologist detected a mixture of the victim's DNA and appellant's DNA on the swab from appellant's left hand and right palm.

At trial, the government also presented testimony from an expert in blood stain pattern analysis and crime scene reconstruction. He testified that blood stains found on the walls of the dining room, where there was blood flow from the stain itself, indicated there was a large volume of blood present in the stain. The expert also testified that there were blood stains, blood spatter, and transfer stains on multiple surfaces of the china cabinet located near the victim's body. Given the multiple locations of the blood stains on the cabinet, he opined it was indicative of

the cabinet being moved during the overall assault. He testified that blood spatter on the ceiling throughout the living room and dining room could be caused from castoff, the physical swinging of an object with blood on it, or from when the victim was being impacted while lying on the floor and the blood spatter hitting the ceiling. He explained that the linear nature of some of the blood stains near the victim's head were also the result of castoff. The expert testified there was blood spatter on several dishes that had fallen from the overturned china cabinet indicating that at least a portion of the blood spatter producing events, impacts to the victim, occurred after the contents of the china cabinet had fallen to the floor. The large impact pattern on the refrigerator door and adjacent to it was consistent with multiple impacts occurring. The expert explained that the blood stains on appellant's shirt, collected when he was apprehended, indicated appellant was in close proximity to the victim when the spatter producing event occurred. He opined that he was not surprised by the minimal amount of blood observed on appellant's person and clothing because blood spatter does not always come back towards the force of the impact or the person swinging the object as much as it would radiate away from the blood source and contact the surrounding areas. The expert also testified that the blood stains visible on the bottom of appellant's socks were transfer stains indicative of appellant walking in fluid blood prior to putting on his sandals.

A pathologist conducted an autopsy on the victim. He testified at trial that there was a minimum of four blunt force injuries to the victim's face but likely many more given the constellation of lacerations, abrasions, and bruising to the face. These injuries could have been caused by impact with a moving object such as a fist, crowbar, tire iron, or some type of similar weapon or by impact with a stationary object such as a windshield or stairs during a fall. There were also sharp force injuries to the victim's face that could be caused by a cut in the skin from a sharp object such as a knife, broken glass, or other sharp object. The forensic pathologist testified that most of the injuries he observed were on the left side of the victim's face. Some of the lacerations were severe enough to expose the fat and deeper tissues requiring more force than surface level skin lacerations. The forensic pathologist testified about multiple additional injuries he observed. The victim had a fractured jaw, and a section of the jawbone was missing. She also had a laceration on her tongue indicating she bit her tongue at some point. The victim suffered a fracture to her left cheek bone which the forensic pathologist noted was a difficult bone to fracture. He explained that a fist alone would not cause such an injury but rather, an object would be required to inflict this type of injury. The victim's left eye was ruptured, and he found blood in her sinuses. The victim had inhaled blood into her lungs, and a tooth, bone shards, and blood were found in the stomach, indicating the victim swallowed these objects. He also found a tooth in the victim's esophagus. The forensic pathologist opined that there were at least four blunt force injuries to the victim's head that caused bleeding between the victim's scalp and skull, subarachnoid hemorrhages, and brain swelling. He testified that the victim's injuries were survivable if she had received medical assistance within minutes and

airway management. The forensic pathologist opined that the cause of the victim's death was blunt force head trauma due to bludgeoning.

### D. Pre-sentencing Hearing

On 16 December 2020, a military judge, sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of unpremeditated murder in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 [UCMJ]. After the military judge entered the finding of guilty, each of the parties presented evidence for the judge's consideration in determining appellant's sentence.

During appellant's pre-sentencing proceedings, the government presented the testimony of several of the victim's family members. The government presented information about the victim's life and the impact her death had on each of them. The victim's sister testified that she had to seek medical attention when she learned of the victim's death. She explained that her work performance declined, she sought counseling, and was taking medication for depression, anxiety, and insomnia. One of the victim's daughters testified she suffered from anxiety and insomnia, does not eat, and has tried to suppress her pain and fear. ▮▮, the victim's daughter who responded to the home on the night of the murder, testified she is fearful to be in small areas with people, experiences nightmares, and suffers from anxiety. ▮▮ also explained that her mother's murder has impacted how she deals with her children and testified that she is afraid to let them go out and play. The victim's older son, who ▮▮ contacted for help on the night of the murder, now lives with ▮▮ and feels he could have done more that night and has had difficulty getting a job. ▮▮, the victim's son who was in the home when the murder occurred, testified that it is hard for him to talk to people and that he has difficulty sleeping. He also testified that he has nightmares and feels guilty as he wishes he could have done more. ▮▮ testified that his younger brother who was with him that night rarely speaks to him and screams in his sleep.

Appellant's trial defense counsel presented evidence in both mitigation and extenuation for the military judge's consideration on an appropriate sentence. Appellant's mother and father both testified. They described appellant as a normal, joyful child who was very kind and caring. Appellant's mother testified that when they first moved to the United States from Jamaica, appellant experienced being bullied in public school so she sent him to a private school. Once in private school, appellant did well, loved math and art and was involved in Junior Reserve Officer Training (JROTC). Both of appellant's parents testified that appellant was very good with his younger sister and was protective of her. Appellant's older brother described appellant as a caring, loving, and generous child. He also testified that appellant got along with everyone with whom he came into contact and described him as a loving person. Appellant's sister testified that appellant was caring and

very protective of her when she was younger and would help her with her homework. She also testified that appellant loved children and was very good with her daughter. All of appellant's family members testified that they would continue to support appellant. Lastly, appellant provided a brief unsworn statement in which he thanked his family for their support and that while he humbly disagreed with the court's decision, he respected the decision. He explained that it had been an honor to serve in the United State Army and as an infantryman. Appellant also requested that the court consider that he had served two years in pretrial confinement. Lastly appellant requested that the military judge consider the testimony of his family members and the circumstances surrounding the case in determining an appropriate sentence.

The military judge sentenced appellant to a dishonorable discharge, confinement for life with the eligibility for parole, and to be reduced to the grade of E-1. The military judge credited appellant with 728 days of pretrial confinement credit. On 3 February 2021, the convening authority approved the findings and sentence.

## LAW AND DISCUSSION

### A. Ineffective Assistance of Counsel

Appellant alleges that his trial defense counsel rendered constitutionally ineffective assistance by: (1) failing to properly prepare appellant's family members for their pre-sentencing testimony; (2) failing to investigate in preparation for pre-sentencing; and, (3) failing to properly investigate appellant's head injury and provide a sufficient justification to support the motion to compel an expert in forensic psychology and neuropsychology.

In support of appellant's assertion of ineffective assistance of counsel, he submitted affidavits from family members who testified in pre-sentencing; military personnel who served with appellant and were willing to testify on his behalf in pre-sentencing; friends from appellant's childhood willing to testify in pre-sentencing; a forensic psychiatrist outlining deficiencies in appellant's pretrial sanity board evaluation; and a forensic psychologist providing information on the evaluation and testing that could have been conducted to evaluate appellant for TBI and a violence risk assessment. Given the conflicting information provided in the affidavits submitted by appellant and those ordered by this court, we ordered a fact-finding hearing in accordance with *United States v. Dubay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

Allegations of ineffective assistance of counsel are reviewed de novo. *United States v. Cueto*, 82 M.J. 323, 327 (C.A.A.F. 2022) (citing *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011)) (citation omitted). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of

9

defense counsel was deficient and that the appellant was prejudiced by the error." *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland v. Washington*, 466 U.S. 668, 698 (1984)).

To establish his counsel's deficiency, appellant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In evaluating performance, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." *Id.* at 689. This presumption can be rebutted by "showing specific errors [made by defense counsel] that were unreasonable under prevailing professional norms." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (cleaned up).

Prejudice is established by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Appellant must show "'a reasonable probability that, but for counsel's [deficient performance] the result of the proceeding would have been different.'" *Captain*, 75 M.J. at 103 (citing *Strickland*, 466 U.S. at 694). In other words, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted). Further, in assessing an ineffective assistance claim, we can analyze *Strickland's* performance and prejudice prongs independently, and if appellant fails either prong, his claim must fail. *Strickland*, 466 U.S. at 687. Thus, an appellate court:

> need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an [IAC] claim on the ground of lack of sufficient prejudice, which *we expect will often be so*, that course should be followed.

*Id.* at 697 (emphasis added).

The Court of Appeals for the Armed Forces (CAAF) recently explained how ineffective assistance of counsel may occur at the court-martial sentencing phase when defense counsel either "fails to investigate adequately the possibility of evidence that would be of value to the accused in presenting a case in extenuation and mitigation or, having discovered such evidence, neglects to introduce that evidence before the court-martial." *United States v. Scott*, 81 M.J. 79, 84 (C.A.A.F. 2021) (internal quotation marks and citations omitted). Even where defense counsel presents several character witnesses, prejudice may still occur at sentencing if there is a "reasonable probability that there would have been a different result if all available mitigating evidence had been exploited by the defense." *Id.* at 84-85 (internal quotation marks and citations omitted).

*B. Failing to Prepare Family Members for Pre-Sentencing Testimony*

Appellant asserts that his defense counsel were ineffective for failing to properly prepare his family members for their pre-sentencing testimony. Specifically, the family members who testified on behalf of appellant in pre-sentencing assert that defense counsel only met with them for approximately fifteen minutes, while trial was on-going, in preparing them for their testimony and that there was more information they wanted to provide during their testimony.

We need not determine whether appellant's defense counsel rendered deficient performance in preparing appellant's family members for their pre-sentencing testimony, because we find that appellant failed to satisfy his burden of establishing prejudice. Appellant's mother, father, sister, and older brother testified on his behalf during the pre-sentencing hearing. They testified about his childhood in Jamaica and the family moving here to the United States for a better life. Appellant's parents testified that he was a joyful child growing up, that he performed well in school, and was an artist. They explained that appellant was a passionate young man who was close with his younger sister and that he liked children. Appellant's mother testified that appellant experienced bullying in school when they first moved to the United States, so she moved the children to a private school where appellant was more himself and did well in school. His mother also testified that appellant was a good child, that she never had any issues with him, and that she would continue to support him. Appellant's older brother testified that appellant was a loving and generous child and that he is still a loving person who gets along with everyone with whom he comes in contact. Appellant's sister testified that appellant was caring and very protective of her when they were young. And, appellant would take the time to assist her with her homework. She also explained that appellant loved his niece and was very caring with his niece. There was no additional mitigation or extenuation evidence provided by appellant's family members during the *Dubay* hearing that they could have provided at trial. Rather, the information provided by family members during the *Dubay* hearing was substantially the same as their trial testimony.

Based upon the lack of additional mitigation evidence appellant's family members would have presented during the pre-sentencing hearing, we find that appellant has failed to establish that he was prejudiced by defense counsel's preparation of the family member's pre-sentencing testimony. There is no reasonable probability that appellant would have received a different sentence even with additional preparation of family members.

*C. Failing to Investigate in Preparation for Pre-Sentencing*

Appellant asserts his defense counsel failed to investigate in preparation for pre-sentencing. Appellant argues that defense counsel neither investigated

information about his military service, nor did defense counsel investigate information that the crime of which appellant was convicted was out of character for him, or that he possessed rehabilitative potential. Appellant asserts that a more thorough investigation by defense counsel would have provided proper context for the crime of which he was convicted and provided the fact-finder with evidence about his overall character. Appellant requests this court set aside his sentence and order a sentencing rehearing. We find that defense counsel were not deficient in investigating appellant's pre-sentencing case and, at any rate, appellant has failed to demonstrate prejudice.

Appellant provided evidence during the *Dubay* hearing in support of his failure-to-investigate claim. Specifically, appellant provided favorable information through testimony or affidavits from two military witness and five childhood friends. All witnesses confirmed they had not been contacted by appellant's defense counsel in preparation for his trial, and all of them indicated they were willing to testify on appellant's behalf if requested. Defense counsel agreed they did not contact any of these witnesses in preparation for appellant's trial. Sergeant (SGT) ███ explained that he served with appellant in the same unit from 2015-2017 and appellant was somewhat mistreated by his leadership at that time, but he was a good overall soldier and did everything required of him. He also testified that appellant often volunteered for duties and would even come in on his days off. Staff Sergeant ███ was a long-time friend of appellant who would have testified about his knowledge of appellant's character and that the offense of which he was convicted was out of character for appellant. There were four childhood friends who would have provided information about appellant's helpful nature; his creative and artistic abilities; his support of family and friends in aiding them when needed; his dependability; and his good rehabilitative potential. They also would have testified that the crime of which he was convicted was out of character of what they knew of appellant. One additional friend would have also testified that when appellant was younger, he was frequently assaulted by others, but appellant always remained calm and that it took a lot for him to be provoked.

Defense counsel provided information about their investigative efforts as to appellant's childhood and military service in preparing for appellant's pre-sentencing hearing. Defense counsel testified that they reviewed the investigative file for information in mitigation and extenuation including identifying individuals who might provide relevant testimony during pre-sentencing. Defense also requested appellant provide the names and contact information of family members who could testify in pre-sentencing. In speaking with appellant's family members, defense counsel learned that appellant's family members strongly believed in appellant's innocence and were resistant in discussing sentencing proceedings. Additionally, appellant was communicating with family members on a consistent basis telephonically and through letters from pre-trial confinement. In these communications, appellant provided details of the investigation and varying

accounts of what occurred the night of his wife's murder. The government intercepted recordings of these phone calls and had placed a few of appellant's family members on its witness list. Thus, at some point, defense counsel made their fact investigator the primary point of contact for the family members so there was consistency in information provided to the family and to limit information provided to the family, given a few of them were now on the government's witness list. However, the defense counsel remained in contact with appellant's sister as the conduit for information to the family. As for appellant's military service, the defense counsel interviewed both of appellant's commanders, his First Sergeant and at least two other [noncommissioned] officers from his unit. These individuals did not provide favorable information about appellant's duty performance. During the government's interviews of these witnesses, the commander stated appellant "wasn't a very competent soldier" and he had "a lot of disciplinary issues." The commander also expressed that he felt it was a "hazard to take PFC Forrest" on deployment. Appellant's First Sergeant stated he was a "chronic underperformer" with "a wide-ranging lack of performance issues." Upon request from appellant, defense also interviewed SGT ███ who had served with appellant who provided some favorable information. Defense counsel also interviewed two additional witnesses for pre-sentencing upon appellant's request. One witness was a chaplain who had provided counseling to appellant and his wife and informed defense counsel he would not provide favorable information in pre-sentencing. The other witness was a female who only provided general information about appellant based upon her brief and limited contact with appellant.

Defense counsel did not investigate appellant's background or history prior to his military service other than interviewing his family members. Rather, defense counsel explained that they relied upon their appointed fact investigator to develop potential information in mitigation. Thus, defense counsel agree that they did not contact the military witnesses or the five childhood friends who would have testified on appellant's behalf. Defense counsel explained that they believed the fact investigator interviewed appellant's family members and inquired as to whether there were additional friends and family who could provide favorable information on appellant's behalf. The fact investigator did not testify at the *Dubay* hearing, but all of the potential witnesses stated that no one had contacted them prior to appellant's trial. Appellant's family members were not asked by the investigator about other potential witnesses but did confirm they were aware of at least three of appellant's childhood friends who were willing to testify on his behalf and would have provided the names of those witnesses if asked.

We find that appellant's defense counsel were not deficient in investigating appellant's presentencing case. Appellant's defense counsel testified at the *Dubay* hearing that there were strategic reasons they presented limited information during appellant's pre-sentencing hearing despite the potential severity of appellant's sentence. In presenting information as to appellant's military service, the defense

counsel recognized that appellant had only served just under two years in the Army at the time of his wife's murder. Appellant did not have a significant service record after his wife's murder because he was placed in pretrial confinement while pending court-martial. Thus, appellant did not possess an extensive military service record. The investigation defense conducted on appellant's military service reflected that appellant's service was less than stellar. Any military witness who testified as to appellant's good duty performance would have likely been rebutted by negative testimony from appellant's leadership.

Any good soldier evidence could have also been rebutted by information about prior domestic violence incidents with the victim resulting in a military protective order issued against appellant by his commander. Defense counsel had successfully litigated a motion restricting the government from presenting that information unless the defense presented evidence rendering that misconduct relevant in rebuttal. Defense counsel were also aware of non-judicial punishment appellant received and did not want to give the government a reason to uncover that information or use it in rebuttal to good soldier evidence. Therefore, defense counsel presented limited information about appellant's service though his unsworn statement. Additionally, the government admitted appellant's enlisted record brief that provided information about his service and awards.

Defense counsel stated they made a strategic decision to only present appellant's immediate family members in providing the military judge information about appellant's character and background prior to joining the military. This decision limited information about appellant's rehabilitative potential and appellant's overall good character to prevent the admission of information about appellant's prior domestic violence incidents with the victim and numerous incidents of misconduct and rules violations while in pretrial confinement.[4] The government also provided the defense with a copy of a police report in which appellant had physically assaulted his sister prior to murdering his wife. To prevent admission of this information, defense counsel strictly limited appellant's pre-sentencing case to just his immediate family and limited their testimony so that no other incidents of

---

[4] Appellant was cited for at least twelve incidents of misconduct or rules violations spanning a period of just nineteen months of his pretrial confinement. Some of these incidents involved failure to comply with rules by covering vents in his cell on multiple occasions and destruction of property when he punched a kiosk when he became frustrated with another inmate. Appellant was cited for several incidents of disrespect to the confinement guards and staff by saying such things as: "Fuck you;" "I ain't talking to you. Bitch;" "You need to get an attitude adjustment because you would not act this hard in the streets;" "You can kiss my ass;" and referring to a female guard using a very graphic word.

misconduct could be admitted in pre-sentencing. In light of appellant's prior domestic violence issues, poor military service, and multiple incidents of misconduct in pretrial confinement, we find that the defense strategic approach to presenting a focused pre-sentencing case was well-reasoned, informed, and objectively reasonable.

We also find that appellant has failed to establish he was prejudiced even if his defense counsel were deficient in their investigation in preparation for pre-sentencing. Even if defense counsel had conducted a more thorough investigation and uncovered the military witness that provided some favorable information about appellant's service, it is very likely the government would have rebutted that testimony with cross-examination about his disciplinary issues or the negative testimony of his commander and First Sergeant. Testimony from appellant's command would have neutralized any good soldier evidence. The testimony of the five childhood friends would have provided some favorable information about appellant's upbringing, character for being calm and non-violent, and rehabilitative potential. However, the government would have likely rebutted this information with appellant's prior domestic violence incidents, assault on his sister, and his anger-filled outbursts and disrespect while in pretrial confinement. Any reference to these incidents could have been very damaging for the military judge's consideration of appellant's rehabilitative potential. The military judge sentenced appellant to confinement for life with the possibility of parole indicating appellant has some rehabilitative potential. The admission of any of these incidents of misconduct could have resulted in confinement for life without parole.

Even if defense counsel had cautiously presented the testimony of the childhood friends without providing opinions as to rehabilitative potential, we find there is no reasonable probability that appellant would have received a different sentence. Appellant was convicted of bludgeoning his wife while her baby grandaughter slept on the couch nearby and her two young sons were upstairs locked in their bedroom, panicked and worried about their mother. The evidence at trial indicated that the victim suffered a painful death in which she swallowed her own teeth and blood and died over a period of at least several minutes based upon the pathologist's testimony. There was no indication appellant rendered the victim any aid while she suffered a slow death. He attempted to destroy evidence by trying to wash himself in the bathroom and attempted to destroy evidence in damaging the victim's cellphone and that of her son. The cellphones were found in a box in the garage and an expert testified there were indications of significant moisture in one of the cellphones. During the government's pre-sentencing case, it presented the impact of appellant's crime. The victim's sister testified that her work performance had declined, she sought counseling, and was taking medication for depression, anxiety, and insomnia. One of the victim's daughters testified she suffered from anxiety, insomnia, and lost appetite, and that she has tried to suppress her pain and fear. ███, the victim's daughter who responded to the home on the night of the

murder, testified that she is fearful to be in small areas with people, experiences nightmares, suffers from anxiety, and is afraid to let her children go outside and play. The victim's older son testified he feels he could have done more that night and that he has had difficulty getting a job. ██, the victim's son who was in the home when the murder occurred, testified that it is hard for him to talk to people, he has difficulty sleeping, he experiences nightmares, and he feels guilty as he wishes that he could have done more. ██ testified that his younger brother who was with him that night rarely speaks to him and screams in his sleep. In appellant's own brief, he admits that the offense of which he was convicted was "undeniably heinous." Based on the gravity of appellant's offense and the impact it had on the victim's children and family members, we find that even with the limited testimony of the five childhood friends, appellant would have received a sentence to confinement for life with parole.

### D. Failing to Properly Investigate Appellant's Head Injury and Provide Justification for Expert in Forensic Psychology and Neurology

Appellant asserts that his counsel rendered ineffective assistance when they failed to properly investigate his head injury and provide sufficient justification for the motion to compel an expert in forensic psychology and neuropsychology. We disagree and find both that counsel did not render deficient performance, and even if they had, appellant cannot show *Strickland* prejudice.

Based upon all available evidence before the defense counsel at the time they filed the motion for an expert consultant in forensic psychology, they properly investigated appellant's head injury and provided the military judge all available evidence before them in requesting the expert. Defense counsel explained at the *Dubay* hearing that they had reviewed appellant's medical records from his accident and did not believe appellant had suffered a TBI. They explained that they believed appellant's original defense counsel had misinterpreted the severity of appellant's head injury from the accident given the results of appellant's CT scan and discharge the following day. Appellant's medical records indicated he had suffered a head injury but a CT scan revealed there were no intracranial injuries. However, defense counsel continued forward with the motion for a forensic psychologist and provided the justification they could, based upon the limited information they possessed, which were the medical records from appellant's treatment because of the motor vehicle accident.

Defense counsel further explained that appellant's sanity board results and various statements he made about the events the night of his wife's murder resulted in their deciding not to pursue the admission of any possible head injury during the merits portion of appellant's court-martial even if the military judge granted to forensic psychologist. Appellant had completed a sanity board evaluation which included the medical records from appellant's accident and appellant discussed the

accident during the evaluation. Appellant's head injury was considered during that evaluation. The sanity board concluded appellant only met the diagnostic criteria for relationship distress with a spouse or intimate partner. Defense counsel also possessed information that appellant had provided varying accounts of what occurred the night of his wife's murder based upon their conversations with him and statements he made to family members. Specifically, defense counsel noted that appellant's recollection of the events of that night changed, in particular, when confronted with the evidence. For the defense counsel, this indicated appellant recalled what occurred the night of the murder. And defense was aware of incidents of domestic violence against his wife that predated the vehicular accident. In light of all of this information, defense counsel did not intend to present information about any potential TBI during the merits portion of the trial. Rather, defense counsel had concluded if the military judge granted the expert, they would use any potential evidence in mitigation for sentencing.

Appellant himself played a role in preventing his defense counsel from presenting additional information to the military judge in support of the requested expert. When the military judge commented on the record that getting appellant evaluated for TBI might be the next logical step in support of the expert request, the government offered defense the opportunity for appellant to be evaluated for TBI. Defense counsel discussed the benefit of TBI testing with appellant on two separate occasions. Counsel explained that submitting to TBI testing, would assist in providing additional justification for the motion to compel the forensic psychology expert. Specifically, defense counsel explained that he would have to submit to TBI testing if they were going to use that as a potential defense. Appellant refused to participate in any TBI testing and expressed he wanted no mental health defense used in the case. Even when counsel explained that the TBI evaluation could be used merely in mitigation if it impacted his memory or caused a blackout, appellant still refused to submit to any TBI testing. When defense counsel explained that his refusal to obtain TBI testing would likely result in a denial of the expert, appellant acknowledged he understood. Considering the limited medical information defense counsel possessed about appellant's head injury the week prior to the murder, the sanity board results, appellant's shifting account of the events the night of the murder, and appellant's refusal to submit to a TBI evaluation, we find that the defense counsel's performance was not deficient in litigating the motion to compel a forensic psychologist.

Appellant also failed to show *Strickland* prejudice, because he has failed to present sufficient information on appeal to demonstrate a reasonable probability that, had the military judge considered the information he presented at the *Dubay* hearing, the military judge would have ruled differently, and that such a ruling would have caused a different result at his trial. First, appellant argues that his defense counsel omitted a definition from the DSM-V that loss of consciousness is evidence of a TBI. Second, he argues that his counsel failed to understand that a

Glascow Coma Score of 7 constitutes a severe head injury nor did his counsel provide such information to the military judge. Third, appellant provided testimony from Dr. ■ and Dr. ■ Dr. ■ explained that an MRI as well as neuropsychological testing could be performed on appellant to determine whether there a brain injury occurred and if so, whether it impacted appellant's executive functioning. Dr. ■ opined that appellant suffered a mild to moderate TBI as a result of the motor vehicle accident based upon his Glascow Coma Score of 7. He further stated appellant suffered only a mild to moderate TBI and that would not have risen to a level of influencing someone's inclination to commit murder. We do not find this evidence compelling enough that it would have persuaded the military judge to grant the motion for the requested expert.

## CONCLUSION

The finding and the sentence are AFFIRMED.

Judge EWING and Judge PARKER concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court